*1059310525*

FILED IN DISTRICT COURT
OKLAHOMA COUNTY

JUL 22 2024

RICK WARREN
COURT CLERK
41

**IN THE DISTRICT COURT OF OKLAHOMA COUNTY**
**STATE OF OKLAHOMA**

| | | |
|---|---|---|
| **MARK R. ALDRIDGE and CAROL L. ALDRIDGE, Individually and as Husband and Wife,** | ) | |
| **Plaintiffs,** | ) | |
| **vs.** | ) | CASE NO. CJ-2024-4667 |
| **THE BAYER CORPORATION, a subsidiary of BAYER, A.G., THE MONSANTO COMPANY; and THE STATE OF OKLAHOMA, *ex rel.*, OKLAHOMA DEPARTMENT OF AGRICULTURE, OKLAHOMA FORESTRY SERVICE and OKLAHOMA FOREST STEWARDSHIP PROGRAM,** | ) | |
| **Defendants.** | ) | |

**PETITION**

COME NOW, the Plaintiffs, Mark R. Aldridge and Carol L. Aldridge, Individually and as husband and wife, ("Plaintiffs"), by and through their undersigned attorneys, and for their claims for relief and action for damages against Defendants Bayer Corporation, Bayer, A.G., the Monsanto Company and The State of Oklahoma, and each of them, allege and state as follows:

1. This is an action for damages suffered by Plaintiffs as a direct and proximate result of Defendants' negligent and wrongful conduct in connection with the design, development, manufacture, testing, packaging, promoting, marketing, advertising, distribution, labeling, and/or sale and/or supervision for use of the herbicide Roundup®, containing the active ingredient, glyphosate.

2. Plaintiffs maintain that Roundup® and/or glyphosate is defective, dangerous to

human health, unfit and unsuitable to be marketed and sold to the public and lacked proper warnings and directions as to the dangers associated with its use.

3. Plaintiffs' injuries were avoidable.

## JURISDICTION AND VENUE

4. This Court has general jurisdiction of the subject matter of this action pursuant to OKLA. CONST. Art. 7, § 7 and enacting legislation.

5. The Bayer Corporation, a subsidiary of Bayer, A.G., is headquartered in Whippany, New Jersey, and regularly conducts business and provides retail products to stores for sale in this judicial district and County, to citizens including Plaintiffs. As such, they are subject to the personal jurisdiction of this Court.

6. The Monsanto Company is registered with the Missouri Secretary of State as a foreign for-profit corporation, with its principal place of business located at 800 N. Lindbergh Blvd., Mail Stop G5EE, St. Louis, Missouri 63167. Monsanto's Missouri State charter number is F00488018.

7. Defendants, Oklahoma Department of Agriculture, Oklahoma Forestry Service and Oklahoma Forest Stewardship Program are Oklahoma political subdivisions subject to the provisions of the Oklahoma Governmental Tort Claims Act at Title 51 O. S. §151, et seq. Plaintiffs have complied with all conditions precedent to the filing of this action as required by Title 51 O. S. §151, et seq. The Plaintiff timely presented a Notice of Claim to the Defendant political subdivisions on April 2, 2024. Plaintiffs' claims were deemed denied by operation of law on or about July 1, 2024. The action is filed within the time proscribed by statute.

8. Defendants do business in Oklahoma County and substantially all the acts and/or events giving rise to the Plaintiffs' claims occurred in Oklahoma County, State of Oklahoma. This

Court has jurisdiction over this lawsuit and venue is proper pursuant to 12 O.S. §§ 133, 134, 137 and 18 O.S. § 471. No diversity exists and original jurisdiction is not proper in the federal courts pursuant to 28 U.S.C. §§1331, 1332, and 1441.

**PARTIES**

9. At all times relevant to this action, the Plaintiffs were citizens and residents of Oklahoma City, Oklahoma County, State of Oklahoma. Plaintiffs bring this action for personal injuries sustained by exposure to Roundup® ("Roundup") containing the active ingredient glyphosate and the surfactant POEA within Oklahoma County, Oklahoma. As a direct and proximate result of being exposed to Roundup, Plaintiff, Mark R. Aldridge, developed non-Hodgkin's Lymphoma. As of the filing of this action, the Plaintiff, Mark R. Aldridge, remains under the care and treatment of medical doctors within Oklahoma County, Oklahoma. Plaintiff, Mark R. Aldridge, is married to Plaintiff, Carol L. Aldridge. Carol L. Aldridge brings a derivative claim in this action is for damages for the loss of companionship, services and consortium of her husband Mark R. Aldridge.

10. "Roundup" as used herein, refers to all formulations of Defendants' roundup products, including, but not limited to, Roundup Concentrate Poison Ivy and Tough Brush Killer1, Roundup Custom Herbicide, Roundup D-Pak Herbicide, Roundup Dry Concentrate, Roundup Export Herbicide, Roundup Fence & Hard Edger 1, Roundup Garden Foam Weed & Grass Killer, Roundup Grass and Weed Killer, Roundup Herbicide, Roundup Original 2k herbicide, Roundup Original II Herbicide, Roundup Pro Concentrate, Roundup ProDry Herbicide, Roundup Promax, Roundup Quik Stik Grass and Weed Killer, Roundup Quikpro Herbicide, Roundup Rainfast Concentrate Weed & Grass Killer, Roundup Rainfast Super Concentrate Weed & Grass Killer, Roundup Ready-to-Use Extended Control Weed & Grass Killer 1 Plus Weed Preventer, Roundup



EXHIBIT 2

Ready-to-Use Weed & Grass Killer, Roundup Ready-to- Use Weed and Grass Killer 2, Roundup Ultra Dry, Roundup Ultra Herbicide, Roundup Ultramax, Roundup VM Herbicide, Roundup Weed & Grass Killer Concentrate, Roundup Weed & Grass Killer Concentrate Plus, Roundup Weed & Grass killer Ready-to-Use Plus, Roundup Weed & Grass Killer Super Concentrate, Roundup Weed & Grass Killer1 Ready-to-Use, Roundup WSD Water Soluble Dry Herbicide Deploy Dry Herbicide, or any other formulation of containing the active ingredient glyphosate.

11. Defendant the Bayer Corporation is the American subsidiary of Bayer, A.G., located in Leverkusen, Germany. The Bayer Corporation has its principal place of business in Whippany, New Jersey. Bayer, A.G. purchased the Monsanto Company on June 7, 2018.

12. The State of Oklahoma by and through its agencies, departments, subdivisions and/or programs named herein above provided approval, oversight, supervision, direction and instruction to the Plaintiffs for the purchase, use, application and consumption of Roundup products to consumers, like Plaintiffs, who regularly purchased Roundup for use on their property located in Oklahoma County, Oklahoma. Upon information and belief, the State of Oklahoma Defendants, by and through their agents, servants and/or employees acting within the scope of their employment, advised, directed, instructed and/or supervised the Plaintiffs' use of Roundup during the relevant time period. (See Oklahoma Forest Stewardship Plan prepared for the Plaintiffs in September, 2008, attached hereto as Exhibit "1.")

13. Defendants the Bayer Corporation, Bayer, A.G., the Monsanto Company, and the State of Oklahoma are collectively referred to herein as "Defendants".

14. Defendants advertise and sell goods, specifically Roundup, in Oklahoma County, Oklahoma.

15. Defendants transacted and conducted business within the State of Oklahoma that

relates to the allegations in this Petition.

16. Defendants derived substantial revenue and benefit directly from goods and products used in the State of Oklahoma.

17. Defendants expected or should have expected their acts to have consequences within the State of Oklahoma, and derived substantial revenue and benefit from intrastate commerce.

18. Defendants engaged in the business of designing, developing, manufacturing, testing, packaging, marketing, distributing, labeling, and/or selling Roundup.

19. Upon information and belief, Defendants purposefully availed themselves of the privilege of conducting business activities within the State of Oklahoma, thus invoking the benefits and protections of its laws.

20. Upon information and belief, Defendants did act together to design, sell, advertise, manufacture, distribute Roundup and direct, monitor and recommend the use of Roundup, with full knowledge of its dangerous and defective nature.

## BACKGROUND FACTS

21. At all relevant times, Defendants were in the business of, and did, design, research, manufacture, test, advertise, promote, market, sell, distribute, and/or have acquired and are responsible for Defendants who have designed, researched, manufactured, tested, advertised, promoted, marketed, sold, and distributed the commercial herbicide Roundup.

22. Bayer/Monsanto is a multinational agricultural biotechnology corporation. Upon information and belief, Monsanto continues to be based in St. Louis, Missouri. It is the world's leading producer of glyphosate. The Monsanto Company is still an active foreign for-profit corporation according to the Office of the Missouri Secretary of State.

23. Monsanto discovered the herbicidal properties of glyphosate during the 1970's and subsequently began to design, research, manufacture, sell and distribute glyphosate based "Roundup" as a broad-spectrum herbicide.

24. Glyphosate is the active ingredient in Roundup. Glyphosate is a broad-spectrum herbicide used to kill weeds and grasses known to compete with commercial crops grown around the globe.

25. Glyphosate is a "non-selective" herbicide, meaning it kills indiscriminately based only on whether a given organism produces a specific enzyme, 5-enolpyruvylshikimic acid-3-phosphate synthase, known as EPSP synthase.

26. Glyphosate inhibits the enzyme 5-enolpyruvylshikimic acid-3-phosphate synthase that interferes with the shikimic pathway in plants, resulting in the accumulation of shikimic acid in plant tissue and ultimately plant death.

27. Sprayed as a liquid, plants absorb glyphosate directly through their leaves, stems, and roots, and detectable quantities accumulate in the plant tissues.

28. Each year, approximately 250 million pounds of glyphosate are sprayed on crops, commercial nurseries, suburban lawns, public parks and golf courses. This increase in use has been driven largely by the proliferation of genetically engineered crops, crops specifically tailored to resist glyphosate.

29. Defendants are intimately involved in the development, design, manufacture, marketing, sale, and/or distribution of genetically modified ("GMO") crops, many of which are marketed as being resistant to Roundup *i.e.*, Roundup Ready®. As of 2009, Defendants were the world's leading producer of seeds designed to be Roundup Ready®. In 2010, an estimated 70% of corn and cotton, and 90% of soybean fields in the United States contained Roundup Ready®

seeds.

30. The original Roundup, containing the active ingredient glyphosate, was introduced in 1974. Today, glyphosate products are among the world's most widely used herbicides. Bayer's/Monsanto's glyphosate products are registered in more than 130 countries and are approved for weed control in more than 100 crops. No other herbicide active ingredient compares in terms of number of approved uses.[1]

31. For nearly 40 years, farmers across the globe have used Roundup, unaware of its carcinogenic properties.

## MONSANTO'S FALSE REPRESENTATIONS REGARDING THE SAFETY OF ROUNDUP®

32. In 1996, the New York Attorney General ("NYAG") filed a lawsuit against Monsanto based on its false and misleading advertising of Roundup. Specifically, the lawsuit challenged Monsanto's affirmative representations that its spray-on glyphosate-based herbicides, including Roundup, were "safer **than table salt"** and "practically **non-toxic"** to mammals, birds, and fish. Among the representations the NYAG found deceptive and misleading about the human and environmental safety of Roundup include the following:

a) Remember that environmentally friendly Roundup herbicide is biodegradable. It won't build up in the soil so you can use Roundup with confidence along customers' driveways, sidewalks and fences…

b) And remember that Roundup is biodegradable and won't build up in the soil. That will give you the environmental confidence you need to use Roundup everywhere you've got a weed, brush, edging or trimming problem.

c) Remember that versatile Roundup herbicide stays where you put it. That means there's no washing or leaching to harm customers' shrubs or other desirable vegetation.

d) Roundup biodegrades into naturally occurring elements.

[1] *Backgrounder*, History of Monsanto's Glyphosate Herbicides, June 2005.

e) This non-residual herbicide will not wash or leach in the soil. It ... stays where you apply it.

f) You can apply Accord with "confidence because it will stay where you put it" it bonds tightly to soil particles, preventing leaching. Then, soon after application, soil microorganisms biodegrade Accord into natural products.

g) Glyphosate's safety margin is much greater than required. It has over a 1,000-fold safety margin in food and over a 700-fold safety margin for workers who manufacture it or use it.

h) Glyphosate is less toxic to rats than table salt following acute oral ingestion.

i) You can feel good about using herbicides by Monsanto. They carry a toxicity category rating of 'practically non-toxic' as it pertains to mammals, birds and fish.

j) "Roundup can be used where kids and pets will play and breaks down into natural material." This ad depicts a person with his head in the ground and a pet dog standing in an area which has been treated with Roundup.[2]

33. On November 19, 1996, Monsanto entered into an Assurance of Discontinuance with the NYAG, in which Monsanto agreed, among other things, "to cease and desist from publishing or broadcasting any advertisements [in New York] that represent, directly or by implication" that:

a) its glyphosate-containing pesticide products or any component thereof are safe, non-toxic, harmless or free from risk.

***

b) its glyphosate-containing pesticide products or any component thereof manufactured, formulated, distributed or sold by Monsanto are biodegradable

***

c) its glyphosate-containing pesticide products or any component thereof stay where they are applied under all circumstances and will not move through the environment by any means.

---

[2] Attorney General of the State of New York, In the Matter of Monsanto Company, Assurance of Discontinuance Pursuant to Executive Law § 63(15) (Nov. 1996).

***

d) its glyphosate-containing pesticide products or any component thereof are "good" for the environment or are "known for their environmental characteristics."

***

e) glyphosate-containing pesticide products or any component thereof are safer or less toxic than common consumer products other than herbicides;

***

f) its glyphosate-containing products or any component thereof might be classified as "practically non-toxic.

34. Monsanto did not alter its advertising in the same manner in any state other than New York, and on information and belief still has not done so today.

35. In 2009, France's highest court ruled that Monsanto had not told the truth about the safety of Roundup. The French court affirmed an earlier judgment that Monsanto had falsely advertised its herbicide Roundup as "biodegradable" and that it "left the soil clean."[3]

**CARCINOGENICITY IN ROUNDUP**

36. On March 4, 1985, a group of EPA Toxicology Branch published a memorandum classifying glyphosate as a Category C oncogene.[4] Category C oncogenes are possible human carcinogens with limited evidence of carcinogenicity.

37. In 1986, the EPA issued a Registration Standard for glyphosate (NTIS PB87-103214). The Registration standard required additional studies of glyphosate's phytotoxicity, environmental fate, toxicology, product chemistry, and residue chemistry. All of the data required

[3] *Monsanto Guilty in 'False ad' Row*, BBC, Oct. 15, 2009, *available at* http://news.bbc.co.uk/2/hi/europe/8308903.stm.
[4] Consensus Review of Glyphosate, Casewell No. 661A. March 4, 1985. United States Environmental Protection Agency.

was submitted and reviewed and/or waived.[5]

38. In October 1991, the EPA published a Memorandum entitled "Second Peer Review of Glyphosate." The memorandum changed glyphosate's classification to Group E (evidence of non-carcinogenicity for humans). Two peer review committee members did not concur with the conclusions of the committee and one member refused to sign.[6]

39. In addition to the toxicity of the active molecule, many studies support the hypothesis that glyphosate formulations found in Defendants' Roundup products are more dangerous and toxic than glyphosate alone.[7] As early as 1991 evidence existed demonstrating that glyphosate formulations were significantly more toxic than glyphosate alone.[8]

40. In 2002, Julie Marc published a study entitled "Pesticide Roundup Provokes Cell Division Dysfunction at the Level of CDK1/Cyclin B Activation." The study found that Defendants' Roundup caused delays in the cell cycles of sea urchins, while the same concentrations of glyphosate alone proved ineffective and did not alter cell cycles.

41. In 2004, Julie Marc published a study entitled "Glyphosate-based pesticides affect cell cycle regulation." The study demonstrated a molecular link between glyphosate-based products and cell cycle dysregulation. The study noted that "cell-cycle dysregulation is a hallmark of tumor cells and human cancer. Failure in the cell-cycle checkpoints leads to genomic instability and subsequent development of cancers from the initial affected cell." Further, "[s]ince cell cycle disorders such as cancer result from dysfunction of unique cell, it was of interest to evaluate the threshold dose of glyphosate affecting cells."[9]

---

[5] http://www.epa.gov/oppsrrd1/reregistration/REDs/factsheets/0178fact.pdf

[6] Second Peer Review of Glyphosate, CAS No. 10712-83-6. October 30, 1991. United States Environmental Protection Agency.

[7] Martinez et al. 2007; Benachoux 2009; Gasnier et al. 2010; Peixoto 2005; March 2004

[8] Martinez et al. 1991

[9] (Molinari, 2000; Stewart et al., 2003)



EXHIBIT 2

42. In 2005, Francisco Peixoto published a study showing that Roundup's effects on rat liver mitochondria are much more toxic and harmful than the same concentrations of glyphosate alone. The Peixoto study suggested that the harmful effects of Roundup on mitochondrial bioenergetics could not be exclusively attributed to glyphosate and could be the result of other chemicals, namely the surfactant POEA, or alternatively due to the possible synergy between glyphosate and Roundup formulation products.

43. In 2009, Nora Benachoux and Gilles-Eric Seralini published a study examining the effects of Roundup and glyphosate on human umbilical, embryonic, and placental cells. The study used dilution levels of Roundup and glyphosate far below agricultural recommendations, corresponding with low levels of residues in food. The study concluded that supposed "inert" ingredients, and possibly POEA, change human cell permeability and amplify toxicity of glyphosate alone. The study further suggested that determinations of glyphosate toxicity should take into account the presence of adjuvants, or those chemicals used in the formulation of the complete pesticide. The study confirmed that the adjuvants in Roundup are not inert, and that Roundup is always more toxic than its active ingredient, glyphosate.

44. The aforementioned results were published in peer-reviewed studies and were at all times available and/or known to Defendants.

45. Defendants knew or should have known that Roundup is more toxic than glyphosate alone and that safety studies on Roundup, Roundup's adjuvants and "inert" ingredients, and/or the surfactant POEA were necessary to protect Plaintiff from Roundup.

46. Defendants knew or should have known that tests limited to Roundup's active ingredient glyphosate were insufficient to prove the safety of Roundup.

47. Defendants failed to appropriately and adequately test Roundup, Roundup's

adjuvants and "inert" ingredients, and/or the surfactant POEA to protect Plaintiff from Roundup.

48. Rather than performing appropriate tests, Defendants relied upon flawed industry-supported studies designed to protect Defendants' economic interests rather than Plaintiff and the consuming public.

49. Despite their knowledge that Roundup was considerably more dangerous than glyphosate alone, Defendants continued to promote Roundup as safe.

**IARC FINDS GLYPHOSATE IN ROUNDUP HARMFUL**

50. The International Agency for Research on Cancer ("IARC") is the specialized intergovernmental cancer agency of World Health Organization ("WHO") of the United Nations tasked with conducting and coordinating research into the causes of cancer.

51. An IARC Advisory Group to Recommend Priorities for IARC Monographs during 2015–2019 met in April 2014. Though nominations for the review were solicited, a substance must meet two criteria to be eligible for review by the IARC Monographs: there must already be some evidence of carcinogenicity of the substance, and there must be evidence that humans are exposed to the substance.

52. IARC set glyphosate for review in 2015-2016. IARC uses five criteria for determining priority in reviewing chemicals. The substance must have a potential for direct impact on public health; scientific literature to support suspicion of carcinogenicity; evidence of significant human exposure; high public interest and/or potential to bring clarity to a controversial area and/or reduce public anxiety or concern; related agents similar to one given high priority by the above considerations. Data reviewed is sourced preferably from publicly accessible, peer-reviewed data.

53. On March 24, 2015, after its cumulative review of human, animal, and DNA studies

for more than one (1) year, many of which have been in Defendants' possession since as early as 1985, the IARC's working group published its conclusion that the glyphosate contained in Defendants' Roundup herbicide, is a Class 2A "probable carcinogen" as demonstrated by the mechanistic evidence of carcinogenicity in humans and sufficient evidence of carcinogenicity in animals.

54. The IARC's full Monograph was published on July 29, 2015, and established glyphosate as a class 2A *probable* carcinogen to humans. According to the authors glyphosate demonstrated sufficient mechanistic evidence (genotoxicity and oxidative stress) to warrant a 2A classification based on evidence of carcinogenicity in humans and animals.

55. The IARC Working Group found an increased risk between exposure to glyphosate and non-Hodgkin's lymphoma ("NHL") and several subtypes of NHL, and the increased risk continued after adjustment for other pesticides.

56. The IARC also found that glyphosate caused DNA and chromosomal damage in human cells.

**<u>EARLY EVIDENCE OF GLYPHOSATE'S DANGER</u>**

57. Despite the new classification by the IARC, Defendants have had sufficient evidence of glyphosate and Roundup's genotoxic properties for decades.

58. Genotoxicity refers to chemical agents that are capable of damaging the DNA within a cell through genetic mutations, a process that is believed to lead to cancer.

59. In 1997, Chris Clements published "Genotoxicity of select herbicides in *Rana Catesbeiana* tadpoles using the alkaline single-cell gel DNA electrophoresis (comet) assay."

60. The study found that tadpoles exposed to Roundup showed significant DNA damage when compared with unexposed control animals.

61. Both human and animal studies have shown that glyphosate and glyphosate-based formulations such as Roundup can induce oxidative stress.

62. Oxidative stress and associated chronic inflammation are believed to be involved in carcinogenesis, and thus cancer.

63. The IARC Monograph notes that "[s]trong evidence exists that glyphosate, AMPA and glyphosate-based formulations can induce oxidative stress."

64. In 2006 César Paz-y-Miño published a study examining DNA damage in human subjects exposed to glyphosate. The study produced evidence of chromosomal damage in blood cells showing significantly greater damage after exposure to glyphosate than before in the same individuals, suggesting that the glyphosate formulation used during aerial spraying had a genotoxic effect on exposed individuals.

65. The IARC Monograph reflects the volume of evidence of glyphosate pesticides' genotoxicity noting "[t]he evidence for genotoxicity caused by glyphosate-based formulations is strong."

66. Despite knowledge to the contrary, Defendants maintain that there is no evidence that Roundup is genotoxic, that regulatory authorities and independent experts are in agreement that Roundup is not genotoxic, and that there is no evidence that Roundup is harmful to humans.

67. In addition to glyphosate and Roundup's genotoxic properties, Defendants have long been aware of glyphosate's carcinogenic properties.

68. Glyphosate and Roundup in particular have long been associated with carcinogenicity and the development of numerous forms of cancer, including, but not limited to, non-Hodgkin's lymphoma, Hodgkin's lymphoma, soft tissue sarcoma and multiple myeloma.

69. Defendants have known of this association since the early to mid-1980s and

numerous human and animal studies have evidenced the carcinogenicity of glyphosate and/or Roundup.

70. In spite of this knowledge, Defendants continued to issue broad and sweeping statements suggesting that Roundup was, and is, safer than ordinary household items such as table salt, despite voluminous scientific evidence to the contrary.

71. Upon information and belief, these statements and representations have been made with the intent of inducing Plaintiff and the public at large to purchase, and increase the use of, Roundup for Defendants' pecuniary gain, and in fact did induce Plaintiff to use Roundup.

72. Defendants made these statements with complete disregard and reckless indifference to the safety of Plaintiff and the general public.

73. Notwithstanding Defendants' representations, scientific evidence has established a clear association between glyphosate and genotoxicity, inflammation, and an increased risk of many cancers, including, but not limited to, NHL, Multiple Myeloma, and soft tissue sarcoma.

74. Defendants knew or should have known that glyphosate is associated with an increased risk of developing cancer, including, but not limited to, NHL, Multiple Myeloma, and soft tissue sarcomas.

75. Defendants failed to appropriately and adequately inform and warn Plaintiff of the serious and dangerous risks associated with the use of and exposure to glyphosate and/or Roundup, including, but not limited to, the risk of developing NHL, as well as other severe and personal injuries, which are permanent and/or long-lasting in nature, cause significant physical pain and mental anguish, diminished enjoyment of life, and the need for medical treatment, monitoring and/or medications.

76. Despite the IARC's classification of glyphosate as a class 2A probable carcinogen,

Defendants continue to maintain that glyphosate and/or Roundup is safe, non-carcinogenic, non-genotoxic, and falsely warrant to users and the general public that independent experts and regulatory agencies agree that there is no evidence of carcinogenicity or genotoxicity in glyphosate and Roundup.

77. Monsanto claims on its website that "[r]egulatory authorities and independent experts around the world have reviewed numerous long-term/carcinogenicity and genotoxicity studies and agree that there is no evidence that glyphosate, the active ingredient in Roundup brand herbicides and other glyphosate-based herbicides, causes cancer, even at very high doses, and that it is not genotoxic".[10]

78. Ironically, the primary source for this statement is a 1986 report by the WHO, the same organization that now considers glyphosate to be a probable carcinogen.

79. Glyphosate, and Defendants' Roundup products in particular, have long been associated with serious side effects and many regulatory agencies around the globe have banned or are currently banning the use of glyphosate herbicide products.

80. Defendants' statements proclaiming the safety of Roundup and disregarding its dangers misled Plaintiff. Despite Defendants' knowledge that Roundup was associated with an elevated risk of developing cancer, Defendants' promotional campaigns focused on Roundup's purported "safety profile".

81. Defendants' failure to adequately warn Plaintiff resulted in 1) Plaintiff using and being exposed to glyphosate instead of using another acceptable and safe method of controlling unwanted weeds and pests; and 2) exposure of Plaintiff and others to the risk of cancer, including NHL, and other injuries associated with Roundup.

---

[10] Backgrounder – Glyphosate: No Evidence of Carcinogenicity. Updated November 2014.



EXHIBIT 2

82. Defendants failed to seek modification of the labeling of Roundup to include relevant information regarding the risks and dangers associated with Roundup exposure.

83. The failure of Defendants to appropriately warn and inform about these hazards has resulted in inadequate warnings in safety information presented directly to users and consumers.

84. The failure of Defendants to appropriately warn and inform about these hazards has resulted in the absence of warning or caution statements that are adequate to protect health and the environment.

85. The failure of Defendants to appropriately warn and inform about these hazards has resulted in directions for use that are not adequate to protect health and the environment.

86. By reason of the foregoing acts and omissions, Plaintiffs seek compensatory damages as a result of Plaintiff, Mark R. Aldridge's, use of, and exposure to, Roundup which caused or was a substantial contributing factor in causing Plaintiff's cancer, specifically NHL, and Plaintiffs suffered severe and personal injuries which are permanent and lasting in nature, physical pain and mental anguish, including diminished enjoyment of life.

87. By reason of the foregoing, Plaintiffs are severely and permanently injured. Plaintiffs have endured and, in some categories continues to suffer, emotional and mental anguish, medical expenses, and other economic and non-economic damages, as a result of the actions and inactions of the Defendants.

**PLAINTIFF'S EXPOSURE TO ROUNDUP**

88. Plaintiff, Mark R. Aldridge, used Roundup beginning in 2007 to control the growth of brush and weeds on his property.

89. For many years, Plaintiff, Mark R. Aldridge, sprayed Roundup on a regular basis. Plaintiff followed all safety and precautionary warnings during the course of use.

90. Plaintiff, Mark R. Aldridge, was subsequently diagnosed with Follicular Non-Hodgkin's Lymphoma in November, 2022.

91. As a result of his injury, Plaintiffs have incurred significant economic and non-economic damages and Plaintiffs will incur significant economic and non-economic damages in the future.

**STATUTE OF LIMITATIONS**

92. Plaintiffs incorporate by reference all prior paragraphs of this Petition as if fully set forth herein.

93. The running of any statute of limitations has been tolled by reason of Defendants' fraudulent concealment. Defendants, through their affirmative misrepresentations and omissions, actively concealed from Plaintiffs the true risks associated with Roundup and glyphosate. Indeed, even as of this filing, Defendants continue to represent publicly, that "*Scientists are in agreement* that there is *no evidence* glyphosate causes cancer." (emphasis added).[11]

94. As a result of Defendants' actions, Plaintiffs were unaware, and could not reasonably know or have learned through reasonable diligence that Roundup and/or glyphosate contact, exposed Plaintiffs to the risks alleged herein and that those risks were the direct and proximate result of Defendants' acts and omissions until May, 2023, when the Plaintiff, Mark R. Aldridge first learned of the dangers associated with the use of Roundup after his cancer diagnosis.

95. Furthermore, Defendants are estopped from relying on any statute of limitations because of their fraudulent concealment of the true hazards of Roundup. Defendants were under a duty to disclose the true character, quality, and nature of Roundup because this was non-public information over which Defendants had and continue to have exclusive control, and because

[11] Backgrounder – Glyphosate: No Evidence of Carcinogenicity. Updated November 2014.

Defendants knew that this information was not available to Plaintiffs or to distributors of Roundup. In addition, Defendants are estopped from relying on any statute of limitations because of their intentional concealment of these facts.

96. Plaintiffs had no knowledge that Defendants were engaged in the wrongdoing alleged herein. Because of the fraudulent acts of concealing their wrongdoing, Plaintiffs could not have reasonably discovered the wrongdoing at any time prior. Defendants had the ability to and did spend enormous amounts of money in furtherance of their purpose of marketing, promoting and/or distributing a profitable herbicide, notwithstanding the known or reasonably known risks. Plaintiffs and medical professionals could not have afforded and could not have possibly conducted studies to determine the nature, extent, and identity of related health risks, and were forced to rely on only the Defendants' representations. Accordingly, Defendants are precluded by the discovery rule and/or the doctrine of fraudulent concealment in asserting any statute of limitations defense.

**FIRST CLAIM FOR RELIEF – NEGLIGENCE**
***(RES IPSA LOQUITOR)***

97. Plaintiffs repeat, reiterate, and re-allege each and every allegation of this Petition contained in each of the foregoing paragraphs inclusive, with the same force and effect as if more fully set forth herein.

98. Defendants had a duty to exercise reasonable care in the designing, researching, testing, manufacturing, marketing, supplying, promoting, packaging, sale, distribution and supervision of the use of Glyphosate/Roundup, a harmful instrumentality, within the Defendants' exclusive control, into the stream of commerce within Oklahoma, including a duty to assure that the product would not cause users to suffer unreasonable, dangerous side effects.

99. Defendants failed to exercise ordinary care in the designing, researching, testing,

manufacturing, marketing, supplying, promoting, packaging, sale, testing, quality assurance, quality control, distribution and/or recommendation and supervision of the use of Roundup into interstate commerce in that Defendants knew or should have known that using Roundup created a high risk of unreasonable, dangerous side effects, including, but not limited to, the development of NHL, as well as other severe and personal injuries which are permanent and lasting in nature, physical pain and mental anguish, including diminished enjoyment of life, as well as need for lifelong medical treatment, monitoring, and/or medications.

100. The negligence by the Defendants, their agents, servants, and/or employees, included but was not limited to the following acts and/or omissions:

a. Manufacturing, producing, promoting, formulating, creating, and/or designing Roundup without thoroughly testing it;

b. Failing to test Roundup and/or failing to adequately, sufficiently, and properly test Roundup;

c. Not conducting sufficient testing programs to determine whether or not Roundup was safe for use; in that Defendants herein knew or should have known that Roundup was unsafe and unfit for use by reason of the dangers to its users;

d. Not conducting sufficient testing programs and studies to determine Roundup's carcinogenic properties even after Defendants had knowledge that Roundup is, was, or could be carcinogenic;

e. Failing to conduct sufficient testing programs to determine the safety of "inert" ingredients and/or adjuvants contained within Roundup, and the propensity of these ingredients to render Roundup toxic, increase the toxicity of Roundup, whether these ingredients are carcinogenic, magnify the carcinogenic properties of Roundup, and whether or not "inert" ingredients and/or adjuvants were safe for use;

f. Negligently failing to adequately and correctly warn the Plaintiff, the public, the medical and agricultural professions, and the EPA of the dangers of Roundup;

g. Negligently failing to petition the EPA to strengthen the warnings associated with Roundup;

h. Failing to provide adequate cautions and warnings to protect the health of users, handlers, applicators, and persons who would reasonably and foreseeably come into

contact with Roundup;

i. Negligently marketing, advertising, and recommending the use of Roundup without sufficient knowledge as to its dangerous propensities;

j. Negligently representing that Roundup was safe for use for its intended purpose, and/or that Roundup was safer than ordinary and common items such as table salt, when, in fact, it was unsafe;

k. Negligently representing that Roundup had equivalent safety and efficacy as other forms of herbicides;

l. Negligently designing Roundup in a manner, which was dangerous to its users;

m. Negligently manufacturing Roundup in a manner, which was dangerous to its users;

n. Negligently producing Roundup in a manner, which was dangerous to its users;

o. Negligently formulating Roundup in a manner, which was dangerous to its users;

p. Concealing information from the Plaintiff while knowing that Roundup was unsafe, dangerous, and/or non-conforming with EPA regulations;

q. Improperly concealing and/or misrepresenting information from the Plaintiff, scientific and medical professionals, and/or the EPA, concerning the severity of risks and dangers of Roundup compared to other forms of herbicides;

r. Negligently recommending the use of Roundup on the Plaintiffs' property;

s. Negligently monitoring the use of Roundup on the Plaintiffs' property; and

t. Negligently selling Roundup with a false and misleading label;

u. Negligently failing to warn users, including the Plaintiffs.

101. Defendants under-reported, underestimated, and downplayed the serious dangers of Roundup.

102. Defendants negligently and deceptively compared the safety risks and/or dangers of Roundup with common everyday foods such as table salt, and other forms of herbicides.

103. Defendants were negligent and/or violated Oklahoma law in the designing,

researching, supplying, manufacturing, promoting, packaging, distributing, testing, advertising, warning, marketing, and selling of Roundup in that they:

a. Failed to use ordinary care in designing and manufacturing Roundup so as to avoid the aforementioned risks to individuals when Roundup was used as an herbicide;

b. Failed to accompany their product with proper and/or accurate warnings regarding all possible adverse side effects associated with the use of Roundup;

c. Failed to accompany their product with proper warnings regarding all possible adverse side effects concerning the failure and/or malfunction of Roundup;

d. Failed to accompany their product with accurate warnings regarding the risks of all possible adverse side effects concerning Roundup;

e. Failed to warn Plaintiff of the severity and duration of such adverse effects, as the warnings given did not accurately reflect the symptoms, or severity of the side effects including, but not limited to, the development of NHL;

f. Failed to conduct adequate testing, clinical testing and post-marketing surveillance to determine the safety of Roundup;

g. Failed to conduct adequate testing, clinical testing, and post-marketing surveillance to determine the safety of Roundup's "inert" ingredients and/or adjuvants;

h. Negligently misrepresented the evidence of Roundup's genotoxicity and carcinogenicity; and

i. Were otherwise careless and/or negligent.

104. Despite the fact that Defendants knew or should have known that Roundup caused, or could cause, unreasonable dangerous side effects, Defendants continued and continue to market, manufacture, distribute, and/or sell Roundup to consumers, including Plaintiffs.

105. Defendants knew of should have known that consumers such as the Plaintiffs would foreseeably suffer injury as a result of Defendants' failure to exercise ordinary care, as set forth above.

106. Defendants' violations of law and/or negligence were the proximate cause of

Plaintiffs' injuries, harm and economic loss, which Plaintiffs suffered and/or will continue to suffer.

107. As a result of the foregoing acts and omissions, the Plaintiffs suffered from serious and dangerous side effects including, but not limited to, NHL, as well as other severe and personal injuries which are permanent and have caused physical pain and mental anguish, diminished enjoyment of life, and financial expenses for hospitalization and medical care. Further, Plaintiff, Mark R. Aldridge, suffered life-threatening NHL, and severe personal injuries, which are permanent and lasting in nature, physical pain and mental anguish, including diminished enjoyment of life. Plaintiff, Carol L. Aldridge, has also suffered the loss of consortium with her husband due to Defendants' acts and omissions as set forth above.

WHEREFORE, Plaintiffs respectfully request that this Court enter judgment in Plaintiffs favor for compensatory and punitive damages, together with interest, costs herein incurred, attorneys' fees and all relief as this Court deems just and proper.

**SECOND CLAIM FOR RELIEF**
**STRICT PRODUCTS LIABILITY – DESIGN DEFECT**

108. Plaintiffs repeat, reiterate and, reallege each and every allegation of this Petition contained in each of the foregoing paragraphs inclusive, with the same force and effect as if more fully set forth herein.

109. At all times herein mentioned, the Defendants designed, researched, manufactured, tested, advertised, promoted, sold, distributed, and/or have acquired the Defendants who have designed, researched, tested, advertised, promoted, marketed, sold, and distributed Roundup as hereinabove described that was used by Plaintiff, Mark R. Aldridge.

110. Defendants' Roundup was expected to and did reach the usual consumers, handlers, and persons coming into contact with said product without substantial change in the condition in

which it was produced, manufactured, sold, distributed, and marketed by the Defendants.

111. At those times, Roundup was in an unsafe, defective, and inherently dangerous condition, which was dangerous to users, and in particular, the Plaintiffs herein.

112. The Roundup designed, researched, manufactured, tested, advertised, promoted, marketed, sold, and distributed by Defendants was defective in design or formulation in that, when it left the hands of the manufacturer and/or suppliers, the foreseeable risks exceeded the benefits associated with the design or formulation of Roundup.

113. The Roundup designed, researched, manufactured, tested, advertised, promoted, marketed, sold, and distributed by Defendants was defective in design and/or formulation, in that, when it left the hands of the Defendants manufacturers and/or suppliers, it was unreasonably dangerous, unreasonably dangerous in normal use, and it was more dangerous than an ordinary consumer would expect.

114. At all times herein mentioned, Roundup was in a defective condition and unsafe, and Defendants knew or had reason to know that said product was defective and unsafe, especially when used in the form and manner as provided by the Defendants. In particular, Defendants' Roundup was defective in the following ways:

a. When placed in the stream of commerce, Defendants' Roundup Products were defective in design and formulation and, consequently, dangerous to an extent beyond that which an ordinary consumer would anticipate.

b. When placed in the stream of commerce, Defendants' Roundup products were unreasonably dangerous in that they were hazardous and posed a grave risk of cancer and other serious illnesses when used in a reasonably anticipated manner.

c. When placed in the stream of commerce, Defendants' Roundup products contained unreasonably dangerous design defects and were not reasonably safe when used in a reasonably anticipated manner.

d. Defendants did not sufficiently test, investigate, or study its Roundup products.

e. Exposure to Roundup presents a risk of harmful side effects that outweigh any potential utility stemming from the use of the herbicide.

f. Defendants knew or should have known at the time of marketing its Roundup products that exposure to Roundup could result in cancer and other severe illnesses and injuries.

g. Defendants did not conduct adequate post-marketing surveillance of its Roundup products.

115. Defendants knew or should have known that at all times herein mentioned its Roundup was in a defective condition and, was and is inherently dangerous and unsafe.

116. Plaintiff, Mark R. Aldridge, was exposed to Defendants' Roundup in the care and treatment of his real property, as described above, without knowledge of Roundup's dangerous characteristics.

117. At the time of the Plaintiff's use of and exposure to Roundup, Roundup was being used for the purposes and in a manner normally intended, as a broad-spectrum herbicide.

118. Defendants with this knowledge voluntarily designed its Roundup with a dangerous condition for use by the public, and in particular the Plaintiffs.

119. Defendants had a duty to create a product that was not unreasonably dangerous for its normal, intended use.

120. Defendants created a product that was and is unreasonably dangerous for its normal, intended use.

121. Defendants marketed and promoted a product in such a manner so as to make it inherently defective as the product downplayed its suspected, probable, and established health risks inherent with its normal, intended use.

122. The Roundup designed, researched, manufactured, tested, advertised, promoted, marketed, sold, and distributed by Defendants was manufactured defectively in that Roundup left

the hands of Defendants in a defective condition and was unreasonably dangerous to its intended users.

123. The Roundup designed, researched, manufactured, tested, advertised, promoted, marketed, sold, and distributed by Defendants reached their intended users in the same defective and unreasonably dangerous condition in which the Defendants' Roundup was manufactured.

124. Defendants designed, researched, manufactured, tested, advertised, promoted, marketed, sold, and distributed a defective product, which created an unreasonable risk to the health of consumers and to the Plaintiffs in particular, and Defendants are therefore strictly liable for the injuries sustained by the Plaintiffs.

125. The Plaintiffs could not, by the exercise of reasonable care, have discovered Roundup's defects herein mentioned or perceived its danger.

126. By reason of the foregoing, the Defendants have become strictly liable to the Plaintiffs for the manufacturing, marketing, promoting, distribution, and selling of a defective product, Roundup.

127. Defendants' defective design, of Roundup amounts to willful, wanton, and/or reckless conduct by Defendants.

128. Defects in Defendants' Roundup were the cause or a substantial factor in causing Plaintiffs' injuries.

129. As a result of the foregoing acts and omission, Plaintiff, Mark R. Aldridge, developed NHL, and suffered severe and personal injuries, which are permanent and lasting in nature, physical pain and mental anguish, including diminished enjoyment of life, and financial expenses for hospitalization and medical care. Plaintiff, Carol L. Aldridge, has also suffered the loss of consortium with her husband due to Defendants' act and omissions as set forth above.

WHEREFORE, Plaintiffs respectfully request that this Court enter judgment in Plaintiffs' favor for compensatory and punitive damages, together with interest, costs herein incurred, attorneys' fees and all relief as this Court deems just and proper.

**THIRD CLAIM FOR RELIEF**
**STRICT PRODUCTS LIABILITY – FAILURE TO WARN**

130. Plaintiffs repeat, reiterate and reallege each and every allegation of this Petition contained in each of the foregoing paragraphs inclusive, with the same force and effect as if more fully set forth herein.

131. Defendants have engaged in the business of selling, testing, distributing, supplying, manufacturing, marketing, and/or promoting Roundup, and through that conduct have knowingly and intentionally placed Roundup into the stream of commerce within Oklahoma with full knowledge that it reaches consumers such as Plaintiff, Mark R. Aldridge, who was exposed to it through ordinary and reasonably foreseeable uses.

132. Defendants did in fact sell, distribute, supply, manufacture, and/or promote Roundup to Plaintiff, Mark R. Aldridge. Additionally, Defendants expected the Roundup that they were selling, distributing, supplying, manufacturing, and/or promoting to reach – and Roundup did in fact reach – consumers, including Plaintiffs, without any substantial change in the condition of the product from when it was initially distributed by Defendants.

133. At the time of manufacture, Defendant could have provided the warnings or instructions regarding the full and complete risks of Roundup and glyphosate-containing products because it knew or should have known of the unreasonable risks of harm associated with the use of and/or exposure to such products.

134. At all times herein mentioned, the aforesaid product was defective and unsafe in manufacture such that it was unreasonably dangerous to the user and was so at the time it was

distributed by Defendants and at the time Plaintiff, Mark R. Aldridge, was exposed to and/or ingested the product. The defective condition of Roundup was due in part to the fact that it was not accompanied by proper warnings regarding its carcinogenic qualities and possible side effects, including, but not limited to, developing non-Hodgkin's lymphoma as a result of exposure and use.

135. Roundup did not contain a warning or caution statement, which was necessary and, if complied with, was adequate to protect the health of those exposed, in violation of 7 U.S.C. § 136j(a)(1)(E).

136. Defendants' failure to include a warning or caution statement which was necessary and, if complied with, was adequate to protect the health of those exposed, in violation of 7 U.S.C. § 136j(a)(1)(E) as well as the laws of the State of Oklahoma.

137. Defendants could have amended the label of Roundup to provide additional necessary warnings.

138. This defect caused serious injury to Plaintiff, Mark R. Aldridge, who used Roundup in its intended and foreseeable manner.

139. At all times herein mentioned, Defendants had a duty to properly design, manufacture, compound, test, inspect, package, label, distribute, market, examine, maintain supply, provide proper warnings, and take such steps to assure that the product did not cause users to suffer from unreasonable and dangerous side effects.

140. Defendants labeled, distributed, and promoted the aforesaid product in a manner that was and is dangerous and unsafe for the use and purpose for which it was intended.

141. Defendants failed to warn of the nature and scope of the side effects associated with Roundup, namely its carcinogenic properties and its propensity to cause or serve as a substantial contributing factor in the development of NHL.

142. Defendants were aware of the probable consequences of the aforesaid conduct. Despite the fact that Defendants knew or should have known that Roundup caused serious injuries, Defendants failed to exercise reasonable care to warn of the dangerous carcinogenic properties and side effect of developing NHL from Roundup exposure, even though these side effects were known or reasonably scientifically knowable at the time of distribution. Defendants willfully and deliberately failed to avoid the consequences associated with their failure to warn, and in doing so, Defendants acted with a conscious disregard for the safety of Plaintiffs.

143. At the time of exposure, Plaintiff, Mark R. Aldridge, could not have reasonably discovered any defect in Roundup prior through the exercise of reasonable care.

144. Defendants, as the manufacturers and/or distributors of the subject product, are held to the level of knowledge of an expert in the field.

145. Plaintiffs reasonably relied upon the skill, superior knowledge, and judgment of Defendants.

146. Had Defendants properly disclosed the risks associated with Roundup, Plaintiff, Mark R. Aldridge, would have avoided the risk of NHL by not using Roundup.

147. The information that Defendants did provide or communicate failed to contain adequate warnings and precautions that would have enabled Plaintiffs, and similarly situated individuals, to utilize the product safely and with adequate protection. Instead, Defendants disseminated information that was inaccurate, false, and misleading and which failed to communicate accurately or adequately the comparative severity, duration, and extent of the risk of

injuries associated with use of and/or exposure to Roundup and glyphosate; continued to promote the efficacy of Roundup, even after it knew or should have known of the unreasonable risks from use or exposure; and concealed, downplayed, or otherwise suppressed, through aggressive marketing and promotion, any information or research about the risks and dangers of exposure to Roundup and glyphosate.

148. To this day, Defendants have failed to adequately warn of the true risks of Plaintiffs' injuries associated with the use of and exposure to Roundup.

149. As a result of their inadequate warnings, Defendants' Roundup products were defective and unreasonably dangerous when they left the possession and/or control of Defendants, were distributed and/or sold by Defendants, and used by Plaintiff, Mark R. Aldridge.

150. As a direct and proximate result of Defendants' actions as alleged herein, and in such other ways to be later shown, the subject product caused Plaintiff, Mark R. Aldridge, to sustain injuries as herein alleged. Plaintiff, Carol L. Aldridge, has also suffered the loss of consortium with her husband due to Defendants' acts and omissions as set forth above.

WHEREFORE, Plaintiffs respectfully request that this Court enter judgment in Plaintiffs' favor for compensatory and punitive damages, together with interest, costs herein incurred, attorneys' fees and all relief as this Court deems just and proper.

**FOURTH CLAIM FOR RELIEF**
**VIOLATIONS OF THE OKLAHOMA CONSUMER PROTECTION ACT**

151. Plaintiffs repeat, reiterate and, reallege each and every allegation of this Petition contained in each of the foregoing paragraphs inclusive, with the same force and effect as if more fully set forth herein.

152. Defendants committed an unfair trade practice and/ or a deceptive trade practice through fraud, deceit, false promises and misrepresentations, that induced Plaintiff, Mark R. Aldridge, to regularly purchase and use Roundup to defoliate his real property, to his detriment.

153. Defendants unfair and/or deceptive trade practices through fraud, deceit and misrepresentation included without limitation the false advertising and mislabeling of its Roundup products with information that indicated Roundup was safe for Plaintiff's ordinary use.

154. As a direct and proximate result of the Defendants' unfair and/ or deceptive trade practices through fraud, deceit, false promises and misrepresentations, Plaintiff, Mark R. Aldridge, suffered from NHL and severe personal injuries which are permanent and lasting in nature, physical pain and mental anguish, including diminished enjoyment of life, financial expenses for hospitalization and medical care, including medical expenses and other economic, and non-economic damages. Plaintiff, Carol L. Aldridge, has also suffered the loss of consortium with her husband due to Defendants' acts and omissions as set forth above.

WHEREFORE, Plaintiffs respectfully request that this Court enter judgment in Plaintiffs' favor for compensatory and punitive damages, together with interest, costs herein incurred, attorneys' fees and all relief as this Court deems just and proper.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs, Mark R. Aldridge and Carol L. Aldridge, and each of them, demand judgment against the Defendants, and each of them, on each of the above-referenced causes of action as follows:

155. Awarding compensatory damages in excess of $75,000, exclusive of attorney's fees and costs, including, but not limited to pain, suffering, emotional distress, loss of enjoyment of life, Plaintiff, Carol L. Aldridge's loss of consortium with her husband, and other non-economic damages in an amount to be determined at trial of this action;

156. Awarding compensatory damages to Plaintiffs for past and future damages, including, but not limited to, Plaintiffs' pain and suffering and severe and permanent personal injuries including health care costs and economic loss;

157. Awarding economic damages in the form of medical expenses, out of pocket expenses, lost earnings and other economic damages in an amount to be determine by a jury at trial;

158. Punitive and/or exemplary damages for the wanton, willful, fraudulent, and reckless acts of the Defendants who demonstrated a complete disregard and reckless indifference for the safety and welfare of the general public and to the Plaintiffs in an amount sufficient to punish Defendants and deter future similar conduct, to the extent allowed by applicable law;

159. Pre-judgment interest;

160. Post-judgment interest;

161. Award Plaintiffs' reasonable attorneys' fees and costs to the extent allowed by applicable law; and

162. For such other and further relief as this Court deems just and proper.

Respectfully submitted,

DEREK K. BURCH, OBA #13004
BURCH, GEORGE & GERMANY
3815 North Classen Boulevard
Oklahoma City, Oklahoma 73118
Telephone: 405-239-7711
Fax: 405-239-7795
derekburch@burch-george.com

and

JOE E. WHITE, JR., OBA #12930
CHARLES C. WEDDLE III, OBA #18869
WHITE & WEDDLE, P.C.
630 N.E. 63rd Street
Oklahoma City, Oklahoma 73105
Telephone: 405-858-8899
Fax: 405-858-8844
joe@whiteandweddle.com
charles@whiteandweddle.com

**JURY TRIAL DEMAND AND ATTORNEY LIEN CLAIMED**

OKLAHOMA FORESTRY SERVICES

# Oklahoma Forest Stewardship Plan

**NW/4 of Section 11, T12N, R3W in Oklahoma County**
**September 2008**

**Prepared For:**

Mark and Carol Aldridge
4912 NW 35th Street
Oklahoma City, OK 73122
mc.aldridge@mac.com
Case #: EM0813

**Prepared By:**

Erin McGuigan, Forester
Oklahoma Forestry Services
Albert Engstrom Forest Regeneration Center
830 NE 12th Ave.
Goldsby, OK 73093
erin.mcguigan@oda.state.ok.us

**A Cooperative Project of:**

**Oklahoma Department of Agriculture, Food and Forestry – Forestry Services**
**University of Oklahoma, Oklahoma Biological Survey – Natural Heritage Inventory**
**Oklahoma Department of Tourism and Recreation**
**U.S.D.A Natural Resources Conservation Service**
**Oklahoma Department of Wildlife Conservation**
**The Oklahoma Chapter of the Wildlife Society**
**Oklahoma Conservation Commission**
**U.S.D.A. Farm Services Agency**
**U.S.D.A Forest Service**

EXHIBIT 1

EXHIBIT 2

# Table of Contents


**LANDOWNER INFORMATION SHEET** .......... **1**

**PROPERTY LOCATION AND DESCRIPTION** .......... **1**

*Figure 1. Aldridge Property Location in Oklahoma County, Oklahoma* .......... *1*

**LANDOWNER OBJECTIVES** .......... **2**

*Figure 2. Aerial Overview of Aldridge Property* .......... *2*

**PROPERTY DESCRIPTION AND RESOURCES** .......... **3**

PRIMARY FOREST TYPE .......... 3
*Climatic Characteristics* .......... *3*
*Physical Characteristics* .......... *3*
*Land Use Characteristics* .......... *3*
*Wildlife Characteristics* .......... *4*
NATURAL HERITAGE INVENTORY REPORT .......... 4
RESOURCE ELEMENTS .......... 5
*Soils* .......... *5*
*Figure 3: Soils Map, Aldridge Property.* .......... *7*
*Water Quality* .......... *8*
*Recreation and Aesthetics* .......... *8*
*Forest Health* .......... *8*
WILDFIRE RISK AND HAZARD ASSESSMENT .......... 8

**FOREST STEWARDSHIP PRESCRIPTIONS** .......... **8**

FOREST STEWARDSHIP PRESCRIPTION #1: FOREST STAND IMPROVEMENT .......... 9
FOREST STEWARDSHIP PRESCRIPTION #2: WILDLIFE HABITAT PLANTINGS .......... 10
*Figure 4. Typical Island (Clump) Planting Design* .......... *11*
FOREST STEWARDSHIP PRESCRIPTION #3: WINDBREAK OR AESTHETIC PLANTING .......... 12
FOREST STEWARDSHIP PRESCRIPTION #4: BURN BRUSH PILES OR REMOVE FROM AREA. .......... 12
FOREST STEWARDSHIP PRESCRIPTION #5: CONSTRUCT A FIREWISE HOME. .......... 12
WHEN AND WHAT SEEDLINGS TO ORDER FOR WILDLIFE HABITAT ENHANCEMENT (PRESCRIPTION #4 ABOVE) .......... 12
*Windbreak or Aesthetic planting to block highline* .......... *13*
*Wildlife Cluster Plantings* .......... *13*
FOREST PRESCRIPTION LOCATIONS .......... 13
*Figure 5. Project Locations* .......... *14*

**RECOMMENDED SITE PREPARATION** .......... **15**

PRE-PLANTING SEEDLING CARE .......... 15
*Figure 6. Heeling In Seedlings for Storage* .......... *16*
PLANTING .......... 16
POST-PLANTING CARE AND MAINTENANCE .......... 17
*Weed Control* .......... *17*
*Irrigation* .......... *17*
*Mulching* .......... *17*
*Fertilization* .......... *17*
*Seedling Protection* .......... *17*
*Insects and Disease* .......... *18*

**FUTURE CONDITION OF PROPERTY AND FOLLOW-UP** .......... **18**

**PLANNING AND ACCOMPLISHMENT REPORT** .......... **19**

APPENDIX A: SIGNED STEWARDSHIP APPLICATION .......... 20
APPENDIX B: SIGNED STEWARDSHIP FOREST LANDOWNER'S CREED .......... 21




EXHIBIT 2

APPENDIX C: LETTER TO OKLAHOMA BIOLOGICAL SURVEY ....................22
APPENDIX D: LETTER FROM OKLAHOMA BIOLOGICAL SURVEY ....................23
APPENDIX E: RESOURCES ....................24
*Assistance* ....................*24*
*General Information* ....................*24*
*Equipment* ....................*24*
*Irrigation* ....................*25*
*Seedlings* ....................*25*
*Weed Barrier* ....................*25*
APPENDIX F: FIREWISE CHECKLIST ....................26
APPENDIX G: USDA POLICY STATEMENT ....................28

# Stewardship Plan Approvals

Landowner: ________________________ Date: __________________

Service Forester: ________________________ Date: __________________



EXHIBIT 2

## Landowner Information Sheet

| | |
|---|---|
| **Case #:** | EM0813 |
| **Landowner:** | Mark and Carol Aldridge |
| **Home address:** | 4912 NW 35th Street Oklahoma City, OK 73122 |
| **Phone #:** | 405-615-9515 or 405-609-3200 |
| **Email:** | mc.aldridge@mac.com |
| **County:** | Oklahoma County |

## Property Location and Description

| | |
|---|---|
| **Legal Description:** | NW/4 of Section 11-T12N-R3W |
| **Total Acres:** | 53 |
| **Forested Acres:** | 50 |
| **Stewardship Acres:** | 53 |
| **Conservation Easement:** | No |
| **Program Funding:** | None |
| **Neighbor Interaction:** | Good |

**<u>Figure 1.</u> Aldridge Property Location in Oklahoma County, Oklahoma.**



## Landowner Objectives

**Primary Objective:** Forest Management

**Secondary Objective:** Wildlife Habitat Enhancement

**Figure 2. Aerial Overview of Aldridge Property**






EXHIBIT 2

# Property Description and Resources

## *Primary Forest Type*

The entire property is located in the Post Oak/Blackjack Game Type.[1] The Post Oak - Blackjack Game Type represents the forest-grassland ecotone and contains dominants from both the deciduous formation and the grassland formation. The overstory is largely composed of post oak *(Quercus stellata)*, blackjack oak *(Q. marilandica)*, and black hickory *(Carya texana)* with the percent of blackjack oak increasing in the composition as one moves west through the Post Oak - Blackjack Game Type. The understory is made up of little bluestem *(Schizachyrium scoparium)*, big bluestem *(Andropogon gerardii)*, and other species depending upon the site.

Its best correlation with other works is with the Oak Savannah of the Soil Conservation Service. There are approximately 17,600 square miles of this condition which includes generally the east central portion of the state with fingers reaching as far west as Cleo Springs in Major County, Curtis in Woodward County, Webb in Dewey County, and western Comanche County. The northeastern portion lying on the north side of the South Canadian, North Canadian, and Cimarron rivers differs importantly from the rest of the Post Oak - Blackjack Game Type. This section is supported by deep sandy Quaternary soils.

## *Climatic Characteristics*

The Post Oak - Blackjack Game Type lies within the climatic province characterized as subhumid, mesothermal and adequate moisture for all seasons. Average annual precipitation varies from 26 inches on the west to 42 inches on the east with the bulk of this type having between 32-40 inches. The Post Oak - Blackjack Game Type usually lies above the flooded lands, and game populations are not influenced by rainy seasons as on adjoining grassland types. Drouth periods here reflect in serious shortage of food and cover plants. However, this is usually furthered by continued heavy grazing.

## *Physical Characteristics*

The topography of this type is characteristically rolling to rough, with sufficient local variation to make for excellent small game conditions. Generally, this type is supported by coarse textured, relatively poor soils developed from residual sandstones and weathered shales. The soils are leached and acid in reaction. The northwest fingers of the type are supported on wind deposited sand for the most part, and is slightly dune-like in relief.

## *Land Use Characteristics*

The Post Oak - Blackjack Game Type, as found through the Cross Timbers agricultural region of the state, presents some of the most serious problems of sheet and gully erosion

---

[1] Duck, L.G. and Fletcher, Jack B. *The Game Types of Oklahoma.* A Report to the Oklahoma Game and Fish Commission. 1943.



EXHIBIT 2

in the country, and productivity of the land as a game producer, as well as a human producer, has been seriously reduced. Farm tenancy is high, averaging around 65-70 percent for the entire type. Better than 50 percent of these tenant families remain on the same farm for only one year or less. The average farm size is around 80 acres and the principal crop is cotton. Grain sorghum, berries, peanuts, and orchards are becoming more important in certain sections. Approximately 75 percent of the type is still in woodland.

## *Wildlife Characteristics*

This type offers more in the way of farm game management possibilities than the other types. Improved farming methods result in better small game habitat. The principal species are the bobwhite, fox squirrel, and cottontail rabbit. Whitetail deer are found scattered throughout the type. Furbearers although locally low, are fully represented here. For the bulk of the type, marginal conditions such as railroad right-of-ways, county road margins, field edges and prairie woods margins account for the main part of the small game habitat. In the center of wooded areas quail are abundant only when soil disturbances have brought about a variation in the vegetation.

For the most part, game populations, particularly bobwhite quail and cottontail, are not in need of serious attention in the northwestern portion of the type. The remainder, however, could be made to support a very much higher quail population than it does at present, largely because burning and heavy grazing result in more serious destruction of game habitat than in the northwest. The soils here are either naturally poor or poor through depletion, and fenced areas often do not show an immediate development as they should. Fertilization is often necessary to restore the vegetation.

Potentially, the post oak-blackjack condition is a good game and fur producer, and because of its large size it warrants serious attention. Practically all large human centers of population east of El Reno are either within or near the type and it probably supports a heavier hunting pressure than any other type. It must be emphasized that the game increase of this type is an agricultural problem and must be attacked through cooperation with farm agencies and local sportsmen, garden clubs, etc.

## *Natural Heritage Inventory Report*

The Oklahoma Natural Heritage Inventory (ONHI) conducted a search of their database for the presence of endangered species or other elements of biological significance on this property. The results of the search found no records of elements of concern at or near the location of the property. The ONHI database is only as complete as the information that has been collected therefore they can not say with certainty whether or not the given location harbors rare species or ecological communities. If in the future endangered species or other elements of biological significance should be sited on the property, contact the Tulsa office of U.S. Fish and Wildlife Service at (918) 581-7458.

## *Resource Elements*

The following resources were observed on the property and make up the land and forest health. The type of plants, activities and wildlife on the property depend on the resource elements available.

### Soils[2]

**AstA - Ashport silt loam, 0 to 1 percent slopes, frequently flooded**
The Ashport component makes up 88 percent of the map unit. Slopes are 0 to 1 percent. This component is on flood plains on valleys. The parent material consists of fine-silty alluvium. Depth to a root restrictive layer is greater than 60 inches. The natural drainage class is well drained. Water movement in the most restrictive layer is moderately high. Available water to a depth of 60 inches is very high. Shrink-swell potential is moderate. This soil is frequently flooded. It is not ponded. There is no zone of water saturation within a depth of 72 inches. Organic matter content in the surface horizon is about 2 percent. This component is in the Loamy Bottomland ecological site. This soil does not meet hydric criteria. The calcium carbonate equivalent within 40 inches, typically, does not exceed 1 percent.

**HarC - Harrah fine sandy loam, 3 to 5 percent slopes**
The Harrah component makes up 82 percent of the map unit. Slopes are 3 to 5 percent. This component is on hillslopes on hills on uplands. The parent material consists of loamy and sandy colluvium derived from sandstone. Depth to a root restrictive layer is greater than 60 inches. The natural drainage class is well drained. Water movement in the most restrictive layer is moderately high. Available water to a depth of 60 inches is moderate. Shrink-swell potential is low. This soil is not flooded. It is not ponded. There is no zone of water saturation within a depth of 72 inches. Organic matter content in the surface horizon is about 1 percent. This component is in the Sandy Savannah ecological site. This soil does not meet hydric criteria.

**LwfA - Lawrie fine sandy loam, 0 to 1 percent slopes, occasionally flooded**
The Lawrie component makes up 80 percent of the map unit. Slopes are 0 to 1 percent. This component is on flood plains on valleys. The parent material consists of loamy alluvium. Depth to a root restrictive layer is greater than 60 inches. The natural drainage class is well drained. Water movement in the most restrictive layer is moderately high. Available water to a depth of 60 inches is high. Shrink-swell potential is moderate. This soil is occasionally flooded. It is not ponded. There is no zone of water saturation within a depth of 72 inches. Organic matter content in the surface horizon is about 2 percent. This component is in the Loamy Bottomland ecological site. This soil does not meet hydric criteria. The calcium carbonate equivalent within 40 inches, typically, does not exceed 1 percent.

**SDND - Stephenville-Darsil-Newalla complex, 3 to 8 percent slopes**
The Stephenville component makes up 48 percent of the map unit. Slopes are 3 to 8 percent. This component is on hillslopes on hills on uplands. The parent material consists of loamy residuum weathered from sandstone. Depth to a root restrictive layer, bedrock,

[2] USDA-NRCS Official Soil Series Descriptions

paralithic, is 20 to 40 inches. The natural drainage class is well drained. Water movement in the most restrictive layer is moderately high. Available water to a depth of 60 inches is very low. Shrink-swell potential is low. This soil is not flooded. It is not ponded. There is no zone of water saturation within a depth of 72 inches. Organic matter content in the surface horizon is about 1 percent. This component is in the Sandy Savannah ecological site. This soil does not meet hydric criteria.

The Darsil component makes up 25 percent of the map unit. Slopes are 3 to 8 percent. This component is on hillslopes on hills on uplands. The parent material consists of sandy residuum weathered from sandstone. Depth to a root restrictive layer, bedrock, paralithic, is 10 to 20 inches. The natural drainage class is excessively drained. Water movement in the most restrictive layer is high. Available water to a depth of 60 inches is very low. Shrink-swell potential is low. This soil is not flooded. It is not ponded. There is no zone of water saturation within a depth of 72 inches. Organic matter content in the surface horizon is about 1 percent. This component is in the Shallow Savannah ecological site. This soil does not meet hydric criteria.

**SDND - Stephenville-Darsil-Newalla complex, 3 to 8 percent slopes**

The Newalla component makes up 23 percent of the map unit. Slopes are 3 to 8 percent. This component is on hillslopes on hills on uplands. The parent material consists of loamy residuum weathered from sandstone over clayey residuum weathered from shale. Depth to a root restrictive layer, bedrock, paralithic, is 40 to 60 inches. The natural drainage class is moderately well drained. Water movement in the most restrictive layer is low. Available water to a depth of 60 inches is moderate. Shrink-swell potential is high. This soil is not flooded. It is not ponded. There is no zone of water saturation within a depth of 72 inches. Organic matter content in the surface horizon is about 2 percent. This component is in the Sandy Savannah ecological site. This soil does not meet hydric criteria. The calcium carbonate equivalent within 40 inches, typically, does not exceed 1 percent. The soil has a slightly sodic horizon within 30 inches of the soil surface.

**Figure 3: Soils Map, Aldridge Property.**






EXHIBIT 2

### Water Quality

The Deep Fork River runs along the north side of the property with smaller tributaries branching off through the center of the property and along the east side of the property.

### Recreation and Aesthetics

The property is forested with many different hardwood species that attract a variety of wildlife species including deer, bobcat, fox, raccoon, and different birds. The property has been unmanaged for many years and is over grown with poison ivy, green briar, and privet. The recreation is limited because of the overgrowth of privet but could eventually be an excellent place for small hikes, hunting, and bird watching. The landowners are currently in the process of removing the privet and greenbrier and planting more desirable species.

### Forest Health

The overall forest health of the property is considered low because of lack of management but could easily be rehabilitated with Forest stand improvement or thinning and some plantings to improve species diversity and age distribution.

### *Wildfire Risk and Hazard Assessment*

Large areas of Oklahoma's forests and plains are increasingly surrounded by or intermixed with urban development. These areas make up the "wildland-urban interface." In the interface, local government is severely challenged to address the needs and expectations of residents for fire protection and other services.

The special challenges wrought by the wildland-urban interface are currently being brought to the forefront by severe wildfires that have destroyed hundreds of homes scattered among the piney woods, Cross Timbers forests, juniper thickets, and grasslands of our state. Homes surrounded by trees may appear to be an idyllic setting, yet the wildfire risk created by vegetation under drought conditions requires special attention to reduce your risk.

The area where this property is located is an excellent example of what is considered "wildland-urban interface" which contains natural forested areas, grasslands and homes and other structures. Unmanaged forested areas present a potential wildfire risk to any structure located in close proximity due to the associated high amounts of fuels in the understory. These fuels contribute to the intensity of any fire which may occur. The following prescriptions will help manage the land to decrease the potential danger of an extremely intense wildfire.

## Forest Stewardship Prescriptions

The prescriptions in this plan are intended to meet the landowner's objectives of forest stand improvement and wildlife habitat enhancement. A stand thinning will allow the forest floor to be opened up for natural regeneration and will remove any invasive tree

species. Wildlife plantings will enhance the habitats for animals by providing better food and cover.

### *Forest Stewardship Prescription #1: Forest Stand Improvement*

The property was surveyed and random plots were put in around the forested area to determine the species composition of the Cross Timber Forest. The forested area looks overstocked because of the numerous amounts of dead or damaged trees and a variety of vines growing on all the trees. The property also has some eastern red cedar (ERC) and privet encroachment. ERC is an opportunistic native species which outcompetes other more desirable species for water and nutrients. The landowners have already begun thinning out the privet and are beginning to remove some of the dead or damaged trees.

When the thin is conducted, the following are the priorities for removals:

- Remove poison ivy, green briar, and other vines. These vines are limiting tree growth and regeneration (A prescribed burn would remove most of these vines).
- Remove eastern redcedar and privet to limit the spread through the property and to open up areas for more acceptable wildlife tree species. If a prescribed fire will be conducted, any eastern red cedar debris should be removed.
- Remove dead, damaged, and diseased trees and the brush piles. To preserve wildlife habitats, about 5 to 10 percent of the forest stand should be snags or dead standing trees. Therefore, make sure not to remove all the dead standing trees in the forest and some brush piles should be scattered throughout the property.

The hardwoods that exist on the property are excellent species for wildlife habitat; these hardwoods include Bur Oak, Blackjack Oak, Post Oak, Catalpa, American elm, Hackberry, Pecan, and Black Walnut.

Thinning the forest stand may also involve some herbicide applications of Tordon RTU or Glyphosate (Roundup). There are several things to consider before and while applying any type of chemicals so carefully read over the following:

BMP Note[3]: Chemicals must be used only in accordance with the manufacture's label instructions and applicable federal and state regulations. The following guidelines cover the handling of forest chemicals in such a way that public health and aquatic habitat will not be endangered by contaminated water.

Maintenance of Equipment

1. No significant leakage of chemicals should be permitted from equipment used for transportation, storage, mixing or application.

Mixing

1. When water is used in mixing, provide an air gap or reservoir between the water source and the mixing tank.

[3] Forestry Best Management Practices Guidelines for Water Quality Management in Oklahoma.



EXHIBIT 2

2. Use uncontaminated pumps, hoses and screens.
3. Mix chemicals and clean tanks only where possible spills would not enter a stream, lake or pond.

Aerial Application
1. Avoid direct entry of chemicals into SMZs, flowing waters and stock ponds.
2. Use a bucket or spray device capable of immediate shutoff.
3. Shut off chemical application during turns and over open water.

Ground Application
1. Avoid direct entry of chemicals into SMZs, flowing waters and stock ponds.
2. Exercise care to not exceed intended or allowable dosage.
3. Utilize injection or stump treatment herbicide methods, where feasible, in areas immediately adjacent to open water.

Limitations on Application
Chemicals should be used only in accordance with:
1. All limitations printed on the Environmental Protection Agency container registration label; and
2. State requirements for registration and regulation of sale or use of pesticides and for licensing of custom applicators and of aerial applicators.

Container Disposal
1. Chemical containers should be removed from the forest and disposed of in a manner conforming to state regulations and label directions.
2. Chemical containers should not be reused if prohibited by label directions.

Equipment Cleanup
1. Cleanup should be accomplished in a location where chemicals will not enter any stream, lake or pond.
2. Cleanup residues should not be permitted to collect in hazardous concentrations, and disposal should be in conformity with state requirements.

## *Forest Stewardship Prescription #2: Wildlife Habitat Plantings*

Once the forest has been thinned and burned, two wildlife clusters can be planted. Each cluster planting will be about a ½ acre in size and the trees should be planted in the recommended spacing. The property will benefit significantly from these plantings because of the additional food diversity and cover for wildlife. The recommended seedlings to order and plant are:

- American Plum (shrub/medium tree)
- Eastern Redbud (shrub/medium tree)
- Arborvitae (conifer)
- Bur Oak (tall tree)
- Common Hackberry (tall tree)

The seedlings should be planted in an island or clump design (See Figure 4.). Trees and shrubs planted for wildlife are typically planted closer together than for other types of plantings. In general, the following planting spacing should be used. When planting trees of different sizes next to each other, use the spacing for the larger of the two:

| | |
|---|---|
| Shrubs | 4 – 5 feet |
| Conifers | 6 – 8 feet |
| Medium trees | 8 – 12 feet |
| Tall trees | 12 – 15 feet |

**Figure 4. Typical Island (Clump) Planting Design**




Where




To be most effective, the planting should be one-quarter to one acre in size.

Native grasses and plants can also be planted in open areas to help enhance the wildlife habitat by providing a wider variety of food for wildlife. The local NRCS office provides technical assistance on soils and native grasses and plants for this area; they can be contacted at 405-843-5031.



EXHIBIT 2

### *Forest Stewardship Prescription #3: Windbreak or Aesthetic Planting*

Plant a row of Loblolly pine at least 30 feet from the highline between the home site and the highline. Before planting, read over the site preparation section and prepare the area for planting. Plant the loblolly pine about 20 feet apart in a straight line. This planting will help block the view of the highline from the house.

### *Forest Stewardship Prescription #4: Burn Brush Piles or Remove from area.*

Currently there are large brush piles under the high lines that would take years to decompose and could cause a potential fire danger to the area. The piles need to be burned or removed from the property. The Oklahoma City Fire Marshall Office was contacted and gave some guidelines to burning on the property:

- A burn must be a least 150 feet from any structure.
- A burn must be at least 500 feet from any neighboring structure.
- A burn must be at least 1000 feet from any oil well.

These regulations do limit where a burn can be placed on the property. There are limited areas because of the surrounding neighborhoods and the oil well located on the west side of the property. Captain Randy Williams did say that a free consult or inspection could be done on the property and if burning is allowed, a burn permit will need to be obtained which costs $85 lasting up to 35 days. To obtain a burn permit or set up an inspection contact the Fire Prevention Office at 405-297-3584.

### *Forest Stewardship Prescription #5: Construct a Firewise home*

It is extremely important to consider the firewise construction and landscaping checklist when building a home in a forested area. Two years ago, in Oklahoma, there were widespread wildfires that caused damage to many different structures. If vegetation surrounding structures or homes is managed well, the risk of damage to the homes or structures is considerably less. Review the firewise construction and landscaping checklist included in the appendix.

### *When and What Seedlings to Order for Wildlife Habitat Enhancement (Prescription #4 above)*

Seedlings are available from the Oklahoma Forest Regeneration Center (www.forestry.ok.gov/frc) located in Goldsby, Oklahoma for planting on your property. The best time to plant the conservation seedlings in Oklahoma is between the months of January and April while the seedlings are still in dormancy. This allows the seedlings to become established before the hot summer months begin.

Your seedling order can be placed as early as October 1, but seedlings are not available for pickup or shipment until January. The following seedlings were recommended for planting on your property:



EXHIBIT 2

**Windbreak or Aesthetic planting to block highline**

| | |
|---|---|
| Loblolly Pine | 100 |

**Wildlife Cluster Plantings**

| | |
|---|---|
| American Plum | 50 |
| Eastern Redbud | 50 |
| Arborvitae | 50 |
| Bur Oak | 50 |
| Common Hackberry | 50 |

## ***Forest Prescription Locations***

The Forest Prescriptions location map (Figure 5.) shows all of the prescriptions that will be accomplished over a three to five year period. The area to be to be thinned is outlined in brown. Proper site preparation is needed to prepare for the wildlife habitat enhancement plantings. The wildlife enhancement plantings can be planted in other locations around the property wherever there are openings.

**Figure 5.** **Project Locations**



## Recommended Site Preparation

Proper site preparation is critical to the success of your planting and actually begins the year prior to planting. This preliminary work reduces competition from weedy species, conserves soil moisture, and makes planting easier.

- In areas with heavy grass sod, a herbicide application in the spring, while the grass is actively growing, is recommended. If the area was cropland this step is not necessary.
- The area should be cultivated in the fall prior to planting in order to loosen the soil, increases moisture penetration and reduce weed competition. In our Oklahoma soils the best method is to plow and then disc the area. Strip cultivation (leaving an undisturbed band of vegetation between rows) is recommended for soils prone to erosion.

<u>BMP Note:</u> Disk-harrowing is an effective treatment against vegetation, which forms a dense root mat just below the soil surface. This method is often used in flatwoods situations and on other flat to gentle topography. On poorly drained sites, bedding with special disking equipment is used to concentrate surface soil and litter into small ridges. Furrowing is the opposite of bedding and provides plowed furrows as planting sites. When using these techniques:

- Avoid complete disking of steep slopes with extremely erodible soils. Disking of alternate strips on the contour may be an acceptable practice on certain side slopes.
- Provide water outlets on bedded or furrowed areas at locations that will minimize movement of sediment. Wherever possible, discharge water onto vegetated surfaces.
- Cultivate again just prior to the seedlings arrival in late winter/early spring.

### *Pre-Planting Seedling Care*

Bareroot seedlings are packed in wet sphagnum moss and shipped in waterproof bags. It is important to plant your seedlings as soon as possible after they arrive. If this is not possible, take proper care of them while they are waiting to be planted. Warm temperatures and dryness will greatly reduce the survivability of the seedlings.

If the seedlings are planted within two weeks of arrival, check the bags for holes or tears and tape any holes to prevent the seedlings from drying out. Keep the bags closed and the packing material around the roots. Once per week, open the bags, check that the roots are damp, add water if necessary, and reseal the bags. The bags should not be piled and should be stored in a cool, ventilated building. Refrigerated storage (34-40°F; 80-100 percent humidity) is best.

**DO NOT ALLOW THE SEEDLINGS TO FREEZE!**

If it is not possible to plant your seedlings within two weeks after you receive them, they should be "heeled in". This is a temporary planting of the seedlings in the soil. The location should be shady and protected from excessive airflow. The soil surrounding the seedlings must be kept moist.

**<u>Figure 6.</u> Heeling In Seedlings for Storage**




## *Planting*

There are two methods to plant your trees – by hand or by machine. Both can provide excellent results and the method of choice usually depends upon the number of seedlings and the terrain to be planted. Tree planters are available to rent from the Oklahoma Forestry Service.[4]

Transport and store seedling bags in cool, shady locations, and protect them from temperature extremes. Reflective tarps may be used.

In the field, take care to protect the roots. Seedlings should be carried in wet burlap or thin slurry of mud and water in a bucket or bag. Remember to keep root exposure to a minimum.

When planting, look for a dark line on the trunk of the seedling just above the roots. This indicates how deep the trees were grown at the nursery. Plant the seedling one inch deeper than this line to allow for soil settling and any erosion that may occur after planting.

---

[4] See Appendix - Resources



EXHIBIT 2

Carefully follow the planting instructions that accompany your order.

## *Post-planting Care and Maintenance*

Care and maintenance do not end once the seedlings are planted. The new planting is still susceptible to weed competition, the lack of moisture, feeding by livestock and rodents, and damage from insects and disease.

### Weed Control

Competition from weeds is the leading cause for failure of newly planted seedlings. Weeds, especially Bermuda grass, should be controlled for the first two to three years, or until the seedlings are big enough to compete for sunlight, moisture, and nutrients. Methods of weed control include fabric weed barrier, mowing, hoeing, cultivation and herbicides.

On planting sites exposed to full sunlight and hot, dry summer winds; remove weeds only two to three feet from around each tree, leaving the rest for protection. Rye, sorghum or Sudan grass planted between rows will act as a "mini" windbreak. Continue these practices for the first two to three years.

### Irrigation

It is essential that newly planted trees receive adequate water. Seedlings should be watered for at least the first two years. Thoroughly soak the root zone and allow drying before watering again. This drying period will promote proper root development. Depending upon soil and weather conditions this drying period may take up to five to ten days.

On small plantings, a soil well two to three feet in diameter around each seedling will facilitate watering. Installation of drip irrigation can save both time and money. Advantages of drip irrigation include watering only the trees and not the weeds, and less water loss due to evaporation. Drip irrigation is very effective and should be used where possible.

### Mulching

A layer of mulch two inches deep in the soil dish area will conserve moisture and control weeds. Straw, grass clippings, sawdust, newspapers or even old feed sacks can be used. Remove all weeds first, and then apply the mulch.

### Fertilization

Seedlings should not be fertilized the first year. After they are established, use a general type fertilizer (10-20-10). Apply the fertilizer early spring (just as the buds break) and again in the fall. Apply about 5 to 7 ounces scattered evenly around the root zone of each seedling. Water thoroughly, and leave no fertilizer on the foliage.

### Seedling Protection

Seedlings are susceptible to damage from equipment, herbicides, livestock, wildlife, and fire.

- Avoid mowing or cultivating over seedlings when controlling weeds. Do not cultivate past the fourth year to avoid possible root damage.
- Herbicides can kill seedlings. Chose the right product for the particular weed you are trying to control. Take extra caution when applying the pesticide by using a guard and spraying on calm days. When using herbicides, always read and follow the label instructions.
- Fence off the planting from livestock for five to seven years. After trees are established, limited grazing is possible in spring and summer when grass is green.
- If the planting is relatively small fencing with chicken wire or plastic guards can provide a barrier to small mammals. Commercial animal repellents are also available, but are not always reliable.
- In late summer, plow a fireline 8-10 ft. wide around the planting to protect the trees from fire.

### Insects and Disease

Inspect your seedlings regularly for signs of insects or disease. Early identification allows early control of these situations. Stressed trees can conceal the effects of insects and disease, so be particularly alert for outbreaks during dry years. If there is an insect, disease or other pest problem, contact your Service Forester for technical assistance.

## Future Condition of Property and Follow-up

Following the recommended Forest Stewardship Prescriptions will enable the property to reach desired conditions. The thinning and prescribed burn will open up the forested area to more wildlife and recreational benefits. The forested stand will become a great place to take small hikes and enjoy bird watching. The wildlife cluster plantings will increase the wildlife food and cover allowing for better habitat and more wildlife observation. The thinning and prescribed burn will also decrease the wildfire risk to the forested area as well as the surrounding neighbors.

Every five years your local service forester will check on your accomplishments and make any revisions needed on the Forest Stewardship plan. If any assistance is needed while implementing the Forest Stewardship Prescriptions contact your local service forester located in Goldsby, Oklahoma at 405-288-2385.

## Planning and Accomplishment Report

| Forest Stewardship Prescription # | Recommended Date | Date Accomplished or Completed |
|---|---|---|
| #1: Forest Stand Improvement | | |
| #2: Wildlife Habitat Plantings | | |
| #3: Windbreak Planting | | |
| #4: Burn or Remove Brush Piles | | |
| #5: Construct a Firewise Home | | |

## *Appendix A: Signed Stewardship Application*

*Mail to: Stewardship Coordinator*
*Okla. Dept. of Agriculture - Forestry Services*
*2800 N. Lincoln Blvd.*
*Oklahoma City, OK 73105*

# Forest Stewardship Application

I am interested in the Oklahoma Forest Stewardship Program and in having a Forest Stewardship Plan developed for my property. I understand that a Forest Stewardship Plan will be developed and the cost of implementing any of the recommended practices I choose is my responsibility.

Mark R. Aldridge
Landowner's Full Name

4912 N.W. 35th Street
Mailing Address

Okla. City OK 73122
City State Zip

405 609 3200 405 949 0411
Daytime Phone Evening Phone

Oklahoma 405 615-7515
County

53 50
Total Acres Forested Acres

11 12N 3W
Qtrs. Sec TWP Range

My primary objective in owning this land is:

Forest Stand Improvement

My secondary objective for my land include:

Wildlife Habitat Enhancement

Home Construction - Firewise

*Please sign the Stewardship Creed on the back of this form.*



EXHIBIT 2

## *Appendix B: Signed Stewardship Forest Landowner's Creed*



### Stewardship Forest Landowners Creed

***I Believe*** the right to own land is about the most treasured and most valued rights of all Americans; and

***I Believe*** the ownership of land not only grants me the privilege of pursuing my own goals but that it also carries the responsibility of good stewardship; and

***I Believe*** that good stewardship of this country's natural resources is necessary to the strength and well being of our great nation; and

***I Believe*** that good stewardship of my forest lands will help provide this country's needs for forest products, for clean air and water, for healthy and thriving populations of fish and wildlife, and for forest based recreation; and

***I Believe*** further that good stewardship of my forest lands will contribute to the natural beauty of Oklahoma and will guard against soil erosion and depletion of soil productivity; and

***I Believe*** that good stewardship also involves protecting my forest lands from insects, diseases, wildfires and overgrazing.

***Therefore I pledge*** to manage my forest lands for the future and for the greater good of society as will as my own personal goals.

Signed ______________________________

Date ______________________________



EXHIBIT 2

## *Appendix C: Letter to Oklahoma Biological Survey*

**State of Oklahoma**

**Department of Agriculture, Food, and Forestry**

2800 N. Lincoln Blvd., P.O. Box 528804, Oklahoma City, OK 73152 (405) 521-3864
www.oda.state.ok.us

**Brad Henry**
**Governor**

**Terry L. Peach**
**Secretary and Commissioner**

October 13, 2008

Mr. Ian Butler
Database Coordinator
Oklahoma Natural Heritage Inventory
111 E. Chesapeake St.
University of Oklahoma
Norman, OK 73019-0575

Mr. Butler:

I am writing a Forest Stewardship Plan for the following properties. I am requesting information on any threatened and endangered species or significant biological communities that occur on the properties to develop sound resource management plans for tree establishment and wildlife habitat. The information you provide will be used to protect or enhance conditions that support a listed species or community.

The properties are located at the following legal land descriptions:

-NW/4 of Section 11-T12N-R3W in Oklahoma County

Any information you can provide would be extremely valuable to this planning effort and all information received will be kept confidential to protect any sensitive species or sites. Please fax the information to (405) 288-6326.

Thank you for your assistance. If you have any questions about the projects, please feel free to contact me at (405) 288-2385.

Sincerely,

Erin McGuigan, Forester
Oklahoma Forestry Services
830 NE 12th AVE
Goldsby, OK 73093
erin.mcguigan@oda.state.ok.us

*The Land We Belong To Is Grand! - Contributing $7.1 Billion for Oklahoma's Economy*



EXHIBIT 2

# *Appendix D: Letter from Oklahoma Biological Survey*

08/06/08 TUE 12:14 [TX/RX NO 6662]

Oklahoma Biological Survey *Oklahoma Natural Heritage Inventory*

OKLAHOMA BIOLOGICAL SURVEY
111 E. Chesapeake Street
Norman, Oklahoma 73019-6112, USA
(405) 325-1985
FAX: (405) 325-7702

Erin McGuigan
Oklahoma Forestry Services
830 NE 12th Avenue
Goldsby, OK 73093

**OBS Ref:** 2008-385-STA-FOR — August 5, 2008

Re: Forest Stewardship Management Plans at T12N R01W S06, T10N R08E S13, and T09N R07W S06 & S07

Dear Mr. McGuigan,

Regarding your request for information on the presence of endangered species or other elements of biological significance at the referenced site(s), we have reviewed the information currently in the Oklahoma Natural Heritage Inventory database and have found no record(s) of elements of concern at or near the location(s) you describe.

Because the ONHI database is only as complete as the information that has been collected, we cannot say with certainty whether or not a given site harbors rare species or ecological communities. For this reason, if you are concerned about species of federal interest, we urge you to consult with the Tulsa office of the U.S. Fish and Wildlife Service (918.581.7458), as they may have additional information of which we are unaware.

The information we provide to you is a product of a cooperative agreement between the Oklahoma Biological Survey (OBS) and the Oklahoma Department of Wildlife Conservation (ODWC). For more information about the likely environmental impacts of your project on state endangered species, please contact William Ray at ODWC (405-424-6062). You may also find our web site helpful for expediting your information request. See http://www.biosurvey.ou.edu/fastforward.html.

Sincerely,

for Justin Woods

Ian Butler
Biological Data Coordinator

08/06/2008 12:20 FAX 405 325 7702 OKLA. BIOLOGICAL SURVEY 002



EXHIBIT 2

## *Appendix E: Resources*

**Assistance**

Oklahoma Dept. of Agriculture, Food & Forestry, 2800 N. Lincoln Boulevard, P.O. Box 528804, Oklahoma City, 73152, (405) 522-6158 (ODAFF).

Oklahoma Dept. of Wildlife Conservation, 1801 N. Lincoln Boulevard Oklahoma City, 73105 - (405) 521-3851 (ODWC).

Conservation Districts and the Natural Resources Conservation Service, in each county (NRCS).

O.S.U. Extension Service, in each county (Ext.).

**General Information**

National Learning Center for Private Forest and Range Landowners
Samuel Jackson, Center Coordinator
2431 Joe Johnson Drive, Room 274
Knoxville, TN 37996-4563
www.forestandrange.org

Oklahoma Native Plant Society
c/o Tulsa Garden Center
2435 South Peoria
Tulsa, Oklahoma 74114

Samuel Roberts Noble Foundation
2510 Sam Noble Parkway
Ardmore, OK 73401 USA
www.noble.org

Wood Industry Association of Oklahoma
13804 E. 450 Rd.
Claremore, OK 74017
www.oakwood.org

Aromatic Cedar Association
Paul Todd, *Pres*
7915 SW 34th
Oklahoma City, OK 73179
www.acedar.org

**Equipment**

The following equipment is available for rental/loan from Oklahoma Forestry Services and is coordinated by the Service Foresters:

- Mechanical Tree Planter – Rental, $25.00/day

- Weed Barrier Machine – Rental, $25.00/day
- Tree Planting Bars (dibble bars) - Loaned to landowners for tree planting projects. A personal check will be filled out by the landowner for the amount of $30.00 and kept on file until the planting bar is returned.

**Irrigation**

Irrigation Station
9500 N Robinson Ave
Oklahoma City OK
73114-3603
405-842-4415

Greer County Conservation District
21619 State Highway 34
Mangum, OK 73554-3948
Phone: 580/782-3581
Fax: 580/782-3670

Additional vendors are listed in the telephone directory under "Irrigation Systems & Equipment"

**Seedlings**

Oklahoma Department of Agriculture, Food and Forestry - Forestry Services
Albert Engstrom Forest Regeneration Center
830 NE 12th Ave
Goldsby, OK 73093-9017
405/288-2385 (Office)
405/288-6326 (Fax)
800/517-3673 (Outside of OKC metro)

**Weed Barrier**

Shaw Fabric Products
8013 First Street, PO Box 1288
Wellington, CO 80549-1288
Phone: (970) 568-0488
Fax: (970) 568-0499

## *Appendix F: Firewise Checklist*

# Firewise Landscaping Checklist

**When designing and installing a firewise landscape, consider the following:**

- ❑ Local area fire history.
- ❑ Site location and overall terrain.
- ❑ Prevailing winds and seasonal weather
- ❑ Property contours and boundaries.
- ❑ Native vegetation.
- ❑ Plant characteristics and placement (duffage, water and salt retention ability, aromatic oils, fuel load per area, and size).
- ❑ Irrigation requirements.

**To create a firewise landscape, remember that the primary goal is fuel reduction. To this end, initiate the zone concept. Zone 1 is closest to the structure; Zones 2-4 move progressively further away.**

- ❑ **Zone 1.** This well-irrigated area encircles the structure for at least 30' on all sides, providing space for fire suppression equipment in the event of an emergency. Plantings should be limited to carefully spaced low flammability species.

- ❑ **Zone 2.** Low flammability plant materials should be used here. Plants should be low-growing, and the irrigation system should extend into this section.

- ❑ **Zone 3.** Place low-growing plants and well-spaced trees in this area, remembering to keep the volume of vegetation (fuel) low.

- ❑ **Zone 4.** This furthest zone from the structure is a natural area. Selectively prune and thin all plants and remove highly flammable vegetation.

**Also remember to:**

- ❑ Be sure to leave a minimum of 30' around the house to accommodate fire equipment, if necessary.
- ❑ Widely space and carefully situate the trees you plant.
- ❑ Take out the "ladder fuels" — vegetation that serves as a link between grass and tree tops. This arrangement can carry fire to a structure or from a structure to vegetation.
- ❑ Give yourself added protection with "fuel breaks" like driveways, gravel walkways, and lawns.

**When maintaining a landscape:**

- ❑ Keep trees and shrubs properly pruned. Prune all trees so the lowest limbs are 6' to 10' from the ground.
- ❑ Remove leaf clutter and dead and overhanging branches.
- ❑ Mow the lawn regularly.
- ❑ Dispose of cuttings and debris promptly, according to local regulations.
- ❑ Store firewood away from the house.
- ❑ Be sure the irrigation system is well maintained.
- ❑ Use care when refueling garden equipment and maintain it regularly.
- ❑ Store and use flammable liquids properly.
- ❑ Dispose of smoking materials carefully.
- ❑ Become familiar with local regulations regarding vegetation clearances, disposal of debris, and fire safety requirements for equipment.
- ❑ Follow manufacturers' instructions when using fertilizers and pesticides.

Access additional information on the Firewise home page: ***www.firewise.org***

Please see the other side of this sheet for the ***Firewise Construction Checklist.***

FWC-200-03-PH



EXHIBIT 2

# Firewise Construction Checklist

**When constructing, renovating, or adding to a firewise home, consider the following:**

- ❑ Choose a firewise location.
- ❑ Design and build a firewise structure.
- ❑ Employ firewise landscaping and maintenance.

**To select a firewise location, observe the following:**

- ❑ Slope of terrain; since fire spreads more rapidly on even minor slopes, be sure to build on the most level portion of the land.
- ❑ Set your single-story structure at least 30 feet back from any ridge or cliff; increase distance if your home will be higher than one story.

**In designing and building your firewise structure, remember that the primary goals are fuel and exposure reduction. To this end:**

- ❑ Use construction materials that are fire-resistant or non-combustible whenever possible.
- ❑ For roof construction, consider using materials such as Class-A asphalt shingles, slate or clay tile, metal, cement and concrete products, or terra-cotta tiles.
- ❑ Constructing a fire-resistant sub-roof can add protection as well.
- ❑ On exterior wall cladding, fire resistive materials such as stucco or masonry are much better choices than vinyl which can soften and melt.
- ❑ Window materials and size are important. Smaller panes hold up better in their frames than larger ones. Double pane glass and tempered glass are more reliable and effective heat barriers than single pane glass. Plastic skylights can melt.
- ❑ Install non-flammable shutters on windows and skylights.
- ❑ To prevent sparks from entering your home through vents, cover exterior attic and under-floor vents with wire mesh no larger than 1/8 of an inch. Make sure under-eave and soffit vents are as close as possible to the roof line. Box in eaves, but be sure to provide adequate ventilation to prevent condensation.
- ❑ Include a driveway that is wide enough to provide easy access for fire engines (12 feet wide with a vertical clearance of 15 feet and a slope that is less than 5 percent). The driveway and access roads should be well-maintained, clearly marked, and include ample turnaround space near the house. Also provide easy access to fire service water supplies, whenever possible.
- ❑ Provide at least two ground level doors for easy and safe exit and at least two means of escape (i.e., doors or windows) in each room so that everyone has a way out.
- ❑ Keep gutters, eaves, and roofs clear of leaves and other debris.
- ❑ Make periodic inspections of your home, looking for deterioration such as breaks and spaces between roof tiles, warping wood, or cracks and crevices in the structure.
- ❑ Periodically inspect your property, clearing dead wood and dense vegetation at a distance of at least 30 feet from your house. Move firewood away from the house or attachments like fences or decks.

**Any structures attached to the house, such as decks, porches, fences, and outbuildings should be considered part of the house. These structures can act as fuel bridges, particularly if constructed from flammable materials. Therefore, consider the following:**

- ❑ If you wish to attach an all-wood fence to your house, use masonry or metal as a protective barrier between the fence and house.
- ❑ Use metal when constructing a trellis and cover it with high-moisture, low flammability vegetation.
- ❑ Prevent combustible materials and debris from accumulating beneath patio decks or elevated porches. Screen or box in areas below patios and decks with wire mesh no larger than 1/8 inch.
- ❑ Make sure an elevated wooden deck is not located at the top of a hill where it will be in direct line of a fire moving up slope. Consider a terrace instead.

Access additional information on the Firewise home page: ***www.firewise.org***

Please see the other side of this sheet for the ***Firewise Landscaping Checklist.***

## *Appendix G: USDA Policy Statement*

"The US Department of Agriculture (USDA) prohibits discrimination in all its programs and activities on the basis of race, color, national origin, gender, religion, age disability, political beliefs, sexual orientation or marital status (Not all prohibited bases apply to all programs). Persons with disabilities who require alternative means for communication of program information (Braille, large print, audiotape, etc. should contact USDA's TARGET Center at (202)720-2600 (voice and TDD).

To file a complaint of discrimination, write USDA, Director, Office of Civil Rights, Room 326-W, Whitten Building, 14th and Independence Avenue, SW Washington DC 20250-9410 or call (202)7205964 (voice and TDD).

USDA is an equal opportunity provider and employer."